### In re GRAND JURY PROCEEDINGS HARRISBURG GRAND JURY 79–1.

**Appeal of Robert McNABB.**

No. 80–2548.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) May 18, 1981.

Decided Sept. 8, 1981.

**212**

Spero T. Lappas, Kusic & Lappas, Harrisburg, Pa., for appellant.

Carlon M. O'Malley, Jr., U. S. Atty., David C. Shipman, Asst. U. S. Atty., Harrisburg, Pa., for appellee.

Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal from a jury conviction and sentence for criminal contempt based on Robert McNabb's failure to comply with a bench warrant that was issued after McNabb ignored a subpoena duces tecum requiring his appearance before a federal grand jury raises several issues concerning the procedural law of criminal contempt. Appellant challenges the failure of the government to file an affidavit of purpose in support of its motion for a bench warrant or enforcement proceeding under 18 U.S.C. § 401. Further, he attacks the failure of the district court to consider the alternative of civil contempt before entertaining criminal contempt proceedings.

### I.

A federal grand jury in Harrisburg was investigating possible criminal conduct in connection with the bankruptcy of Global Realty Company, a corporation of which McNabb was a former president and principal shareholder. In the course of the proceedings, a subpoena for McNabb's appearance was issued in February 1980. Because McNabb could not be found, that subpoena was never served on him. On March 10, 1980, however, a subpoena duces tecum issued, commanding McNabb to appear before the grand jury on March 27. An FBI agent served this second subpoena on McNabb in Florida, on March 14.

The day before McNabb's required grand jury appearance, his counsel sought a continuance from the United States Attorney. Realizing that the grand jury term was ending and that there would be no grand jury meeting for another month, the United States Attorney refused any postponement. He further indicated that he would seek a bench warrant if McNabb failed to appear. McNabb did not appear. Consequently, on

March 28, the district court, in response to the government's motion for a bench warrant for McNabb's arrest, issued the requested warrant pursuant to 18 U.S.C. § 401. The United States Attorney notified McNabb's counsel of the bench warrant, and this information was then conveyed to McNabb.

That same day, March 28th, McNabb fled to North Carolina with his family and some bodyguards. Although McNabb refused to reveal his whereabouts, he called his counsel each day to inquire about receipt of the warrant. During this period McNabb also used two false names in several bank transactions. McNabb was finally arrested on June 4. At that point, the United States Attorney applied for criminal contempt proceedings based on McNabb's wilful failure to appear before the grand jury and his subsequent intentional concealment of his whereabouts. Taking account of these circumstances, and reasoning that because the grand jury had been dismissed McNabb would be unable to purge himself civilly, the district court issued an order to show cause why McNabb should not be held in criminal contempt.

McNabb was tried and convicted by a jury on the charge of criminal contempt. At trial, McNabb as well as government witnesses testified that McNabb had received threats against himself and his family both before and after issuance of the subpoena. Although McNabb relied on these threats to justify his refusal to obey the subpoena, the district court, in ruling on a post-trial motion, found that McNabb

> did not contact police for protection or school officials concerning the threats to his children. Indeed, McNabb told one of his bodyguards not to worry about it. Furthermore, none of the specific threats related directly to his appearance before the grand jury.

After denying the motion for a new trial or, in the alternative, in arrest of judgment, the district court sentenced McNabb to eight months in prison. He now appeals, and we affirm.

## II.

McNabb's principal assault on his criminal contempt conviction is based on a rule of this Court, known as the *Schofield* Rule, requiring the government to make a minimal showing of proper purpose before invoking the district court's powers to enforce obedience to a grand jury subpoena. The *Schofield* rule was adopted pursuant to the federal court's supervisory power over grand juries and over civil proceedings brought in the district court under 28 U.S.C. § 1826(a). Devised in the context of a witness who refused to furnish handwriting exemplars, fingerprints and photographs, the rule imposes a duty on the government "to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85, 93 (3d Cir. 1973).

In demanding application of the *Schofield* affidavit requirement in the present case, McNabb seeks to make two unwarranted extensions. First, the *Schofield* case addressed the propriety of *matters* requested by the subpoena; it did not purport to encompass the appropriateness of an *appearance* before the grand jury. Second, the procedural safeguards fashioned in *Schofield* involved the factual showing which must be made before a district court adjudges a witness in *civil* contempt—there was no intimation that steps in *criminal* contempt proceedings would be necessarily analogous.

■ Although a subpoena to appear before a grand jury may be inconvenient or burdensome, it is not viewed as a "seizure" within the meaning of the Fourth Amendment. *See United States v. Dionisio*, 410 U.S. 1, 9, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973). Based on the well-settled principle that the public has a right to every man's evidence, the Supreme Court has long recognized that "citizens generally are not constitutionally immune from grand jury subpoenas." *Branzburg v. Hayes*, 408 U.S. 665,

682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972).[1] Indeed, the grand jury's authority to subpoena witnesses to testify is not only firmly established, but essential to its inquisitorial task. *See Blair v. United States*, 250 U.S. 273, 279–81, 39 S.Ct. 468, 470–471, 63 L.Ed. 979 (1919).

Several fundamental assumptions underlie the refusal by the Supreme Court to extend the protection of the Fourth Amendment to grand jury subpoenas to testify. The historic notion of a civic obligation to give evidence before a grand jury in itself removes any stigma from the undeniable burden caused by a grand jury subpoena. *See Blackmer v. United States*, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932); *Blair v. United States, supra*, 250 U.S. at 281, 39 S.Ct. at 471. Practical differences between the compulsion exerted by grand jury subpoenas and the intrusion occasioned by an arrest or investigative stop provide another premise for withholding Fourth Amendment safeguards.

> The latter is abrupt, is effected with force or the threat of it and often in demeaning circumstances, and, in the case of arrest, results in a record involving social stigma. A subpoena is served in the same manner as other legal process; it involves no stigma whatever; if the time for appearance is inconvenient, this can generally be altered; and it remains at all times under the control and supervision of a court.

*United States v. Doe (Schwartz)*, 457 F.2d 895, 898 (2d Cir. 1972) (Friendly, J.). Ultimately, the assumption of grand jury neutrality—that it is a "protective bulwark standing between the ordinary citizen and the overzealous prosecutor"—justifies that body's broad investigative powers, its authority to act on tips or rumors and to examine as many witnesses as necessary to ferret out all clues. *See Branzburg v. Hayes, supra*, 408 U.S. at 701, 92 S.Ct. at 2666; *Wood v. Georgia*, 370 U.S. 375, 392, 82 S.Ct. 1364, 1374, 8 L.Ed.2d 569 (1962).

■■ Because a compulsory appearance before a grand jury is not an unreasonable seizure within the meaning of the Fourth Amendment, there would not appear to be justification for requiring a *Schofield* affidavit to establish reasonableness, relevance and propriety in this context. The simple fact of nonappearance provided the government with probable cause to apply for a bench warrant for McNabb. The authority of a court to issue bench warrants to arrest witnesses who fail to appear is, in fact, unquestioned. *See Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *Blair v. United States, supra*, 250 U.S. at 281–82, 39 S.Ct. at 471. Indeed, the necessity to show reasonableness might well invert the grand jury's function, requiring that body to furnish answers to its questions before it could ask them. Such a dysfunctional demand would be much like the situation described in *Hale v. Henkel*, in which the witness refused to answer the questions posed on the ground that no specific "charge" was pending before the grand jury. The Supreme Court declared: "[I]t is impossible to conceive that ... the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted." 201 U.S. 43, 65, 26 S.Ct. 370, 375, 50 L.Ed. 652 (1906). Inasmuch as grand juries are subject to judicial control and subpoenas can be challenged by motions to quash,[2] any further requirement that would saddle a grand jury with preliminary showings to procure attendance would unnecessarily impede its investigation and

1. It is not clear when grand juries first resorted to compulsory process for witnesses. As early as 1612, in the Countess of Shrewsbury's case, Lord Bacon is reported to have declared that "all subjects, without distinction of degrees, owe to the King tribute and service, not only of their deed and hand, but of their knowledge and discovery." 2 How.St.Tr. 769, 778 *cited in*

*Blair v. United States*, 250 U.S. 273, 279–80, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919).

2. *See United States v. Dionisio*, 410 U.S. 1, 12, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973), *citing Branzburg v. Hayes*, 408 U.S. 665, 707–08, 92 S.Ct. 2646, 2669–2670, 33 L.Ed.2d 626 (1972) (grand juries must operate within the limits of the First as well as the Fifth Amendments).

frustrate the public's interest in the fair and expeditious administration of the criminal laws. *Cf. United States v. Dionisio, supra*, 410 U.S. at 17, 93 S.Ct. at 773 (declining to burden a grand jury with a "mini-trial" to establish a preliminary showing of reasonableness when witness refused to testify).

Significantly, in no case cited by McNabb to support his argument did the grand jury witness refuse altogether to attend the proceedings. Rather, the subpoenaed party appeared before the grand jury and only then declined to comply with requests for documents, testimony, handwriting or voice samples. *See In re Grand Jury*, 587 F.2d 589 (3d Cir. 1978) (because intervenor lacks standing in motion to quash subpoena for legislative records there is no need to reach question whether *Schofield* applies to intervenors); *In re Grand Jury Appeal of Hartzell*, 542 F.2d 166 (3d Cir. 1976) (witness before grand jury pursuant to writ of habeas corpus ad testificandum refused to answer questions despite grant of immunity; record, however, indicated that the subpoena satisfied *Schofield* requirements); *In re Grand Jury Proceedings (Schofield I), supra* (witness before grand jury challenged government request for handwriting exemplars, fingerprints and mug shot). Just as the *Schofield* requirements were held to be inappropriate in the context of a suppression hearing conducted *after* a witness had complied with a subpoena and testified, see *United States v. Oliva*, 611 F.2d 23 (3d Cir. 1979),[3] *Schofield* affidavits would ap-

pear to be similarly inapplicable to refusals *before* a witness has even appeared to testify, especially absent claims of undue governmental harassment.[4]

■ Here, there is no reason to disturb the district court's discretion to issue a bench warrant rather than to postpone further the date of McNabb's grand jury appearance. McNabb's counsel had called the United States Attorney the day before McNabb's scheduled appearance and sought a continuance, citing inconvenience. But the record discloses no basis for the claim of inconvenience and contains nothing to outweigh the prosecutor's interest in securing McNabb's appearance before the grand jury term expired.[5] Thus, McNabb's simple failure to appear provided the court with probable cause to issue a bench warrant. *See Blackmer v. United States*, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932); *United States v. Evans*, 574 F.2d 352, 355 (6th Cir. 1978); Fed.R.Crim.P. 17(g).

■ Inasmuch as the bench warrant did not, pursuant to either the Constitution or to procedures articulated by the Court, require supporting *Schofield* affidavits, the failure to provide them certainly does not render the arrest unlawful. McNabb, however, challenges the validity of the bench warrant issued by the Court on a related ground, alleging that it charged a violation of 18 U.S.C. § 401, a proposition not set forth in the government's underlying motion. 18 U.S.C. § 401 provides:

Power of court

---

**3.** In *Oliva* the grand jury witness had been indicted later for giving false testimony during his appearance. The Court stressed that *Schofield* requirements "did not deal with procedural safeguards surrounding the *issuance* of grand jury subpoenas, but with the procedures appropriate to enforcement proceedings." *Id.* at 25. Clearly, the enforcement proceeding under section 1826(a), in the face of a refusal to testify, not the issuance of the subpoena, is the triggering event for the affidavit requirement.

**4.** The Supreme Court has long upheld the wide-ranging investigative powers of the grand jury precisely because although "abuse of this power may be imagined, as if the object of the inquiry were merely to pry into the details of domestic or business life, . . . were such abuses

called to the attention of the court, it would doubtless be alert to repress them." *Hale v. Henkel*, 201 U.S. 43, 65, 26 S.Ct. 370, 375, 50 L.Ed. 652 (1906).

**5.** Although McNabb later testified that threats against himself and his family received shortly before the return date of the subpoena justified his refusal to appear, the district court found that none of the threats related to the grand jury appearance and that, in fact, McNabb was unperturbed by the purported threats. Instead, the court found that the issuance of the bench warrant, rather than the threats, triggered both McNabb's flight and his subsequent attempt to conceal his whereabouts.

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command. June 25, 1948, c. 645, 62 Stat. 701.

McNabb's case falls squarely within the niche defined by section 401(3).[6] Because the federal rule delimiting contempt sanctions for failure to obey a subpoena makes no distinction between civil and criminal contempts,[7] a recalcitrant witness presumably could be charged with criminal contempt pursuant to section 401 and Fed.R. Crim.P. 42(b). *See In re Grand Jury Proceedings* (Schofield I), *supra* at 88. Even if the government's application for a bench warrant should have recited 18 U.S.C. § 401 or the warrant should have confined itself to the specific reference in the motion, such a variance does not void a subsequent, valid conviction. *See Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975); *United States v. United Mine Workers*, 330 U.S. 258, 294, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947). Quite plausibly, the district judge, presented with a potential witness who wilfully refused to appear, viewed

civil contempt proceedings concomitant with the expiration of the grand jury's term as a futile exercise.[8] Moreover, in *United States v. North*, 621 F.2d 1255 (3d Cir. 1980) (en banc), which required this Court to engage in a post hoc evaluation of whether a district court was acting on the basis of civil or criminal contempt, we directed that, "[i]n the future, district judges should specify the particular nature of the contempt and the conditions, if any, attached to sentence, including the statutory authority upon which the contempt is predicated." *Id.* at 1265. It would appear that in citing to 18 U.S.C. § 401 the district court was complying, even at the initiation of the proceedings, with this mandate.

■ It should be stressed that in this context the ·procedural safeguards embodied in the *Schofield* rule are unnecessary, and any possible defect in the bench warrant here is rendered harmless precisely because a defendant in criminal contempt proceedings has the full panoply of safeguards accorded a criminal defendant.[9] While Fed.R.Crim.P. 42, governing criminal contempt, authorizes summary punishment for contumacious acts committed in the presence of the court, see subsection (a), it otherwise requires notice and a full hearing. Rule 42(b). In addition to the guarantee set forth in Rule 42(b) of "a reasonable time for the preparation of the defense," a criminal contempt defendant has the right to

---

**6.** Grand juries have traditionally been regarded as an arm of the court. The Constitution itself makes the grand jury a part of the judicial process. *See Levine v. United States*, 362 U.S. 610, 617, 80 S.Ct. 1038, 1043, 4 L.Ed.2d 989 (1960); *Hale v. Henkel, supra*, 201 U.S. at 66, 26 S.Ct. at 375. Moreover, courts, not grand juries, are the institutions empowered to issue grand jury subpoenas. Fed.R.Crim.P. 17.

**7.** Fed.R.Crim.P. 17(g) provides:

CONTEMPT. Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued . . . .

**8.** *Cf. Shillitani v. United States*, 384 U.S. 364, 371–72, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966): "Where the grand jury has been finally discharged, a contumacious witness can no

longer be confined since he then has no further opportunity to purge himself of contempt. . . . Once the grand jury ceases to function, the rationale for civil contempt vanishes and the contemnor has to be released."

**9.** *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), which stated that "criminal contempt is a crime in the ordinary sense," *id.* at 201, 88 S.Ct. at 1482, provides an important foundation for these rights. *Bloom* held that a right to jury trial is fundamental in criminal contempt cases where confinement may exceed six months. Only the right to indictment and the right to jury trial—if the term of imprisonment authorized by statute or sought to be imposed is less than six months—may be withheld from criminal contempt defendants.

counsel [10] and the right to refuse to testify. He is favored with a presumption of innocence, and must be found guilty beyond a reasonable doubt.[11] Indeed, the very absence of constitutional and Fed.R.Crim.P. 42(b) safeguards for civil contemnors, and the uncertainty over the procedural rights required in section 1826 proceedings—the type of proceeding involved in *Schofield* —assists in explaining the judicially devised *Schofield* protection for witnesses charged with contempt pursuant to section 1826. Thus, this larger perspective highlights *McNabb's* misplaced reliance on additional procedural safeguards. The criminal contempt proceedings employed here complied with due process: McNabb had adequate notice,[12] was provided with an attorney, and accorded a jury trial. Though it might have been appropriate to refer to section 401 in the application for the bench warrant, the government's failure to do so did not deprive McNabb of any constitutional right and thus provides no basis for invalidating the subsequent conviction.[13]

### III.

■ McNabb's other major attack on his conviction focuses on the court's failure to consider civil contempt before sanctioning the criminal contempt proceedings. Civil contempt is primarily coercive or remedial in nature; it is designed to benefit the party complaining to the court about the contemnor's recalcitrance, whether that be a refusal to testify or, as here, a refusal

to appear. In contrast, criminal contempt is punitive in character; it is aimed at vindicating the court's authority in the face of contumacious and disrespectful acts. *See United States v. Asay*, 614 F.2d 655, 659 (9th Cir. 1980); *Smith v. Sullivan*, 611 F.2d 1050, 1053 (5th Cir. 1980); *In re Grand Jury Investigation*, 600 F.2d 420, 422–423 (3d Cir. 1979). Based on the doctrine that a court must exercise "[t]he least possible power adequate to the end proposed," *Anderson v. Dunn*, 6 Wheat. 204, 231, 5 L.Ed. 242 (1821), the Supreme Court in *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), created a procedural rule to circumscribe a court's contempt power. It required that "The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be inappropriate." *Id.* at 371 n.9, 86 S.Ct. at 1536 n.9. Although *Shillitani* was concerned with refusals by witnesses to testify, there is no reason to question the applicability of the "least restrictive alternative" principle to other instances of noncompliance with court orders.

■ Some circuits have required district judges to make clear, on the record, their consideration and rejection of the civil contempt procedure which would employ the least power adequate to achieve the end sought. *See United States v. DiMauro*, 441 F.2d 428 (8th Cir. 1971). However, we recently noted in *United States v. North, supra* that "[t]his circuit has not subscribed to the latter rule" which requires the trial

---

**10.** In combination, *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925), which held that the assistance of counsel, if requested, was required in a criminal contempt prosecution, except for contempt committed in open court, and *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), which found a right to appointed counsel wherever a defendant faces imprisonment, would appear to cover the issue of counsel for criminal contemnors.

**11.** *See Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911).

**12.** *See Blackmer v. United States*, 284 U.S. 421, 440, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932) (order to show cause issued to witness who failed to attend grand jury proceeding satisfies

due process requirement of suitable notice and adequate opportunity to appear and to be heard).

**13.** As noted in *ITT Community Development Corp. v. Barton*, 569 F.2d 1351 (5th Cir. 1978): "It is a well established principle that an order of civil contempt cannot stand if the underlying order on which it is based is invalid. In contrast, the validity of a criminal contempt adjudication resulting from the violation of a court order does not turn on the meritoriousness of that order." *Id.* at 1356. If the validity of the order allegedly disobeyed is not open to question, it is difficult to understand how McNabb could prevail on a claim that the bench warrant "exceeded the extent" of the underlying order.

judge to set forth the decisionmaking process on the record. *Id.* at 1261 n.9. Notwithstanding the advantages of such an explicit procedure, the district court was not obligated to consider expressly civil contempt prior to the institution of criminal contempt proceedings. Moreover, the district judge offered a post hoc explanation of the inappropriateness of civil contempt proceedings and the necessity for criminal sanctions against McNabb in his memorandum denying defendant's post trial motion for a new trial or for arrest of judgment.

 The recognition in *Shillitani* that the less restrictive alternative admonition has little force if the contemnor is already incarcerated, and therefore unlikely to respond to a threat of summary civil contempt, is equally valid in the present context as well. At the time of the issuance of the bench warrant here, McNabb did not even comply with a basic prerequisite of 28 U.S.C. § 1826: that the witness be in attendance at the grand jury proceedings. By the time of McNabb's arrest and the government's application for criminal contempt proceedings, section 1826 was similarly unavailing as a feasible, less draconian alternative to criminal contempt. Since the grand jury was no longer in session, the section 1826(a)(2) sanction—confinement not in excess of the term of the grand jury—was devoid of force. Clearly, criminal contempt proceedings remained the only viable option for the court.

## IV.

We have considered McNabb's plethora of challenges which include a *Brady* claim and charges of trial error regarding the court's refusal to limit the scope of the cross-examination of the defendant; its allowance of testimony about the bank transactions; its failure to charge the jury concerning duress; and the court's instruction that threats cannot constitute a defense to the crime charged. Having found all the issues raised by the defendant to be without merit, the order of the district court will be affirmed.